**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MELANIE PINA, <br> on behalf of Plaintiff and the class members <br> described below, <br><br>         Plaintiff, <br><br>    vs. <br><br> LOAN SPOT doing business as <br> BLUE MOUNTAIN LOANS; <br> 391 FINANCIAL, INC.; <br> VELOCITY VENTURES GROUP, <br> LLC doing business as <br> INFINITY ENTERPRISE <br> LENDING SYSTEMS; <br> LEAD ENVY, LLC doing business as <br> TEKAMBI; <br> and JOHN DOES 1-20, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT – CLASS ACTION

1.      Plaintiff, Melanie Pina, brings this action to secure redress from predatory and unlawful loans (such as <u>Exhibit A</u>). The loans are made in the name of Defendant Loan Spot, doing business as Blue Mountain Loans ("Blue Mountain"), via the website www.bluemountainloans.com. Others involved in the making of the loans include 391 Financial, Inc. ("391 Financial"); Velocity Ventures Group, LLC doing business as Infinity Enterprise Lending Systems ("Infinity");  Lead Envy, LLC doing business as Tekambi ("Tekambi"); and John Does 1-20.

2.      Plaintiff seeks a declaratory judgment that the loans are void (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III—the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§1964 (Counts IV-V).

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d), in that the amount in controversy on a classwide basis exceeds $5 million, exclusive of interest and costs, and in that there are believed to be over 100 members of the class, all of whom are of diverse citizenship to Defendants.

4.     This Court has personal jurisdiction over Defendants because they:

a.     Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.     Selected which states to offer loans in, thereby targeting those states. *Illinois v.*

*Hemi Group*, *LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

5.      Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Illinois.

6.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008)(summarizing statutes allowing 5% to 8% interest).

## PARTIES

### Plaintiff

7.      Plaintiff Melanie Pina is a citizen of Illinois residing in Norridge, Illinois.

### Defendants

8.      Defendant Loan Spot, doing business as Blue Mountain Loans ("Blue Mountain"), purports to be an entity chartered pursuant to the laws of the Kashia Band of Pomo Indians of the Stewarts Point Rancheria (the "Tribe"), a federally recognized Indian Tribe. Blue Mountain can be served at Kashia Band of Pomo Indians Tribal Office, 1420 Guerneville Rd., #1, Santa Rosa, CA 95403. Blue Mountain issues loans to consumers over the Internet through the website www.bluemountainloans.com.

9.      Defendant 391 Financial is a Missouri corporation with a principal address of 4013 Frontgate Dr., Columbia, MO 65203. Its registered agent and office is Clay B. Bethune, 5522 Prairie Creek, Columbia, MO 65203.

10.     Defendant Infinity is a limited liability company organized under Florida law which operates at 4864 Sparks Blvd., Sparks, NV 89436. Its registered agent and office is Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, NV 89123.

11.     Defendant Tekambi is a Delaware limited liability company with a principal business address of 23150 Fashion Drive, Suite T242, Estero, FL 33928.  Its registered agent and office is Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE  19803.

### FACTS RELATING TO PLAINTIFF

12.     On or about September 18, 2024, Blue Mountain Loans made a $1200 loan to Plaintiff Melanie Pina through bluemountainloans.com at a stated annual percentage rate of 493.41%.  (Exhibit A)

13.     Plaintiff obtained the loan for personal, family, or household purposes and not for business purposes.

14.     Blue Mountain disbursed the loan proceeds via ACH into Plaintiff's bank account in Illinois.

15.     The loan was to be repaid via ACH debits from Plaintiff's bank account in Illinois.

16.     At no time did Plaintiff set foot on Kashia tribal lands.

17.     Plaintiff obtained the loan via the Internet from Illinois.  (Exhibit B)

18.     At no time did Blue Mountain have a license from the Illinois Department of Financial and Professional Regulation  to make loans to Indiana residents.

19.     Blue Mountain regularly makes loans to individuals in Illinois at such rates. On information and belief, they have made over 100 such loans.

20.     The loans were obtained for personal, family or household purposes and not for business purposes.

21.     Defendants sought out Illinois residents for such loans

### INVOLVEMENT OF OTHER DEFENDANTS IN BLUE MOUNTAIN LOANS 391 FINANCIAL

22.     While Blue Mountain is purportedly owned by the Tribe, in reality, the Tribe has virtually nothing to do with the operation of the lending business and simply participates in what is often referred to as a "rent-a-tribe" scheme.

23. Blue Mountain is beneficially owned and operated by 391 Financial.

24. 391 Financial receives the overwhelming percentage of profits generated.

25. In a "rent-a-tribe" scheme, non-tribal payday lenders attempt to circumvent state usury laws by invoking the sovereign immunity available to Native American tribes.

26. While the non-tribal entities operate all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections for the high-interest loans, the tribe acts as a label or figurehead in exchange for what is often a relatively insignificant portion of the revenue generated.

27. Supposedly, Blue Mountain Financial operates under a lending license granted by the Kashia Tribe under a "lending commission ordinance." (Exhibit C)

28. The ordinance—"Ordinance #12"—was approved by the Kashia Tribe on August 10, 2013, right before the Kashia Tribe began its first of what would become many "rent-a-tribe" schemes.

29. The Kashia Tribe is a small, isolated, financially-strapped Native American tribe with approximately 78 members living on its reservation.

30. Supposedly, the Kashia Tribe operates over a dozen different online lending websites—all of which make small-dollar, short-term loans at triple-digit interest rates—including Evergreen Cash, Redwood Coast Finance, Spring Water Finance, Pave Credit, and others.

31. Such lending enterprises would make tens of millions of dollars of loans per year and require hundreds of employees to staff.

32. The Kashia Tribe claims to operate from offices located at 1420 Guerneville Road, Suite 1, Santa Rosa, CA 95403; the office is located in the Coddingtown Plaza Business Park, is roughly 1,000 square feet, and serves as the offices of the tribal government overseeing road work, construction, and other services.

33. The Kashia Tribe's "lending commission ordinance" does not require a person obtaining a license to be a Tribal member, nor does it require any particular percentage or revenue

to be retained by the Tribe.

34. The "lending commission ordinance," at Part V, "Operational Requirements and Limitations on Lending Business Activities," paragraph B, sub-paragraph 2, "Consumer Loan Amounts; Fees and other Charges," states "[n]o lender licensee may charge fees, interest or other consideration for the granting of a consumer loan that exceeds $40 per $100 lent." (Exhibit C)

35. The Loan made to Plaintiff charges more than $40 in fees per $100 loaned.

36. According to the Tribe's ordinance, Part V, "Operational Requirements and Limitations on Lending Business Activities," paragraph B, sub-paragraph 3, "Loan Terms; Repayment; Extensions," "[t]he initial term of each consumer loan granted by a Lender Licensee shall be at least 3 days but no more than 45 days."

37. The loan made to Plaintiff is for a term of more than 45 days.

38. All essential business operations necessary to make the Blue Mountain loans are actually performed in other locations outside of the Tribe's jurisdiction, including Missouri, by and for the benefit of non-tribal investors.

39. These operations include incoming and outgoing phone calls and emails, review of loan applications, loan underwriting, payment processing, website maintenance, and marketing.

40. BlueMountainLoans.com, first registered in August 2021, was copied from another website, AmericasCashAdvanceInc.com, registered in 2010 and operated by 391 Financial since that time.

41. AmericasCashAdvanceInc.com is the website of America's Cash Advance, a lending business owned and operated by 391 Financial, which makes loans to consumers at interest rates as high as 790% annually.

42. The text and layout of both websites are substantially the same. For example, both websites are titled: "Apply for a cash loan online. We are a direct lender."

43. The home page of both prominently features the phrase "QUICK LOANS FROM $100 to $1,200, 3 simple steps to get the funds you need." (Exhibits D, E)

44.     Both home pages feature the same "How It Works" section with identical language other than the phone number, including "[y]ou will receive a call within 15 minutes after completing the steps above. We can be reached at [phone number] for any assistance that may be needed."

45.     The "application information" and "why us" sections are identical, except for the name of the lender.

46.     The "FAQ" (frequently asked questions) pages of both websites contain the identical 18 questions and answers, in the same order, with the same text and language other than the name of the lender.

47.     The IPv4 address of americascashadvanceinc.com is 104.21.35.160, which is a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:3032::6815:23a0.

48.     The IPv4 address of bluemountainloans.com is 104.26.10.85, which is  also a server hosted by Cloudfare, Inc.; the IPv6 address is 2606:4700:20::681a:b55.

49.     The digits 2606:4700 mean the websites are hosted by Cloudfare, Inc. in the same physical data center.

50.     391 Financial raises cash from individual accredited investors, paying them between 11% to 13% annual interest. *See* https://www.391financial.com.

51.     391 Financial informs prospective investors that funds placed with it for investment are used to finance short-term, high interest, small-dollar consumer loans, stating:  "Our interest rates are designed to compensate for the loans that go into default and are never repaid. It is a high risk/high reward business; thus, we have to charge higher interest rates to compensate for the defaults and the small loan amounts. Our investors' interest rate is a fixed amount and is not tied to the performance of individual loans."

52.     In response to an FAQ "Do the usury laws apply?", 391 Financial states: "No. In most states usury laws typically apply to mortgages, but not small consumer loans. States allow high rates on small consumer loans due to  the economics of this market. This allows lenders to serve this market profitably."

-7-

53. This statement is untrue. That it was made shows that 391 Financial knows that its loans are illegal.

54. 391 Financial also tells investors "[w]e obtain licensing and follow each state law that we operate in," even though it makes loans via Blue Mountain Loans in Indiana, without a lending license.

55. 391 Financial claims to be part of FFG, LLC, which does business as FinTech Finance Group.

56. FinTech Finance Group's Vice President is Blake Richter, who was previously the Vice President of Operations for Plain Green, LLC.

57. Plain Green operated under a rent-a-tribe scheme similar to that of Blue Mountain Loans. One court described Plain Green as "a payday lending entity cleverly designed to enable [] Defendants to skirt federal and state consumer protection laws under the cloak of tribal immunity. That immunity is a shield, however, not a sword . . . Tribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

58. 391 Financial has a related entity called FinTech Call Center, which provides call center services for lending operations such as Blue Mountain Loans.

**<u>INFINITY</u>**

59. Infinity is a "back-end" services vendor that provides software to analyze, underwrite, service, and collect high-interest loans.

60. Infinity states that its software "can support your vision… and your success. We have built the industry's best solution for Payday loan management. *See* https://www.fintechfinance.io/about-us. "Our Business Rules Engine will meet your exact lending model and grow along with you. Schedule ACH transactions and reminder messages for automatic payment processes. Follow-up reminders will keep your CSR's on-task when working customer accounts. Refinancing a loan is as easy as clicking a button. Infinity is built to manage your Payday

loan product no matter where you are lending."

61.    Payday Loan Manager is software for operating a payday lending website, including "an integrated ACH provider that automatically handles the crediting and debiting of your loans."

62.    Infinity's website, infinitysoftware.com, as well as paydayloanmanager.com, are hosted on servers owned or managed by Infinity, with an IP address of 169.55.60.156. (Exhibit F)

63.    More than 100 different payday lending websites are hosted by Infinity on the same server, many of which claim sham "tribal" affiliations.

64.    Infinity's website even features testimonials from non-tribal individuals who are, nonetheless, listed as owners or executives of ostensibly "tribal" payday lenders.

65.    One such testimonial is from Dustin A. Dernier ("Dernier"), who is identified as "CEO 605 Lending." (Exhibit G)

66.    Dernier states, "[t]he Infinity Team has helped us grow our start up into something to be very proud of. The entire team has been there for us every step of the way." *Id.* (emphasis added).

67.    Another testimonial is from John Humphrey ("Humphrey"), identified as "COO DMP Investments." (Exhibit H)

68.    DMP Investments LLC is owned by the Texas payday loan magnate William C. Pruett ("Pruett"), who operates numerous payday lending businesses, including several operated under a "rent-a-tribe" model, including Sky Trail Cash, supposedly owned by the Lac du Flambeau Tribe in rural Wisconsin. It makes loans to consumers in many states at triple-digit rates.

69.    Humphrey states: "Your software platform provided the ideal mix of processing capacity, high availability, and resource scalability that each proved vital components throughout our implementation. We sincerely appreciate the relationship with our friends at Infinity Software and consider their software platform an indispensable resource in operational landscape." *Id.*

70.    Infinity's website features a video touting how its software features "end-to-end loan process automation" and can "automate the loan collection process for maximum results."

71. Infinity thus provides and manages the software which underwrites and collects Blue Mountain loans, including the loan to Plaintiff, and also manages the ACH transactions involving Plaintiff's bank account in Illinois. The software was stored and ran on servers belonging to Infinity.

72. Infinity received a portion of the profits from the Blue Mountain loans.

73. Infinity provides such services to multiple Internet lenders, including BuffaloLakeLending.com, supposedly owned by the Crow Creek Sioux Tribe in South Dakota, SkyCashUSA.com5, CashAisle.com, and CashAisle.net.

**TEKAMBI**

74. A key component to a successful Internet lending business is the identification of consumers who are willing to take out triple-digit interest rate loans and also have the financial means to repay such loans.

75. To automate this process, lenders making such loans often utilize firms to purchase leads, analyze those leads, and then underwrite the loan if the lead elects to apply for a loan.

76. Tekambi advertises itself on its website as "the smartest way to manage lead data" and states that "Tekambi's unique lender solutions optimize the lender / borrower lifecycle." *See* https://tekambi.com/.

77. Tekambi's services include "loan origination and decisioning, underwriting and fraud prevention, customer management, and collections and debt management." *Id.*

78. According to a March 1, 2022, press release, Tekambi is "a customer-focused online lead management system for alternative credit lenders. With reliability and flexibility at its core, Tekambi is a robust plug-and-play solution that changes the way lenders manage their marketing campaigns and lead filtering process." Press Release, GlobeNewswire, "Aquila expands across lending vertical with acquisition of Tekambi" (March 1, 2022), https://www.globenewswire.com/en/newsrelease/2022/03/01/2394530/0/en/Aquila-expands-across-lending-vertical-with-acquisition-of-Tekambi.html.

-10-

79.     Tekambi actively promotes its software at trade gatherings catering to customers, and potential customers, who make online loans at triple-digit interest rates, including the "Tribal Lending Summit" held in August 2022 in Lac du Flambeau, Wisconsin. Tekambi was one of the premium sponsors of the Tribal Lending Summit.

80.     By actively promoting its software and services at venues exclusively devoted to online lending at triple-digit rates, Tekambi actively encourages online lenders to use its products for illegal loans.

81.     Tekambi receives payment from Blue Mountain.

## RENT-A-TRIBE SCHEMES

82.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

83.     Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

84.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

85.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme to scheme, the number is almost always in the single digits.

86.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

87.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

88.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

89.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

90.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

91.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

-12-

92.     The excessive interest charges imposed by Defendants were intentional.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

93.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

94.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

95.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

96.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

97.     Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under

815 ILCS 205/6.

98.     Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

99.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

100.    The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *See, e.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569); *In the Matter of Money Mutual, LLC,* No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

101.    The excessive interest charges imposed by Defendants were willful.

## COUNT I - DECLARATORY AND INJUNCTIVE
## RELIEF AGAINST ILLEGAL CONDUCT

102.    Plaintiff incorporates paragraphs 1-101.

103.    This claim is against all Defendants.

104.    There is a controversy between Plaintiff and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff and the class members must repay the loans made

to them.

105.    Declaratory relief will resolve such controversy.

106.    An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

107.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

108.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Blue Mountain Loans at more than 9% interest (c) which loan has not been paid in full.

109.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

110.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

111.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

112.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

113.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

114.    Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

115.    The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of

all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

     i.     Injunctive relief;

     ii.     Declaratory relief;

     iii.     Restitution of all amounts collected on the loans from members of the class;

     iv.     Costs of suit; and

     v.     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

116. Plaintiff incorporates paragraphs 1-101.

117. This claim is against all Defendants.

118. Defendants contracted for and collected loans at more than 9% interest from Plaintiff and the class members, in violation of 815 ILCS 205/4.

119. Plaintiff and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

120. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

121. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Blue Mountain Loans at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

122. Plaintiff may alter the class definition to conform to developments in the case and discovery.

123. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there

are at least 100 class members.

124. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

125. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

126. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

127. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Damages as provided in 815 ILCS 205/6;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other and further relief as the Court deems proper.

**COUNT III – PREDATORY LOAN PREVENTION ACT
AND ILLINOIS CONSUMER FRAUD ACT**

128. Plaintiff incorporates paragraphs 1-101.

129. This claim is against all Defendants.

130. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

131. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act. 815 ILCS 505/1 *et seq.*

-17-

## CLASS ALLEGATIONS

132.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

133.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Blue Mountain Loans at more than 36% interest (c) on or after March 23, 2021.

134.    Plaintiff may alter the class definition to conform to developments in the case and discovery.

135.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

136.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

137.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained  counsel experienced in class actions and consumer credit litigation.

138.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

139.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.    Individual actions are not economically feasible.

    b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.    Compensatory damages;

        ii.    Punitive damages;

        iii.    Attorney's fees, litigation expenses and costs of suit; and

iv.     Such other and further relief as the Court deems proper.

## COUNT IV – RICO

140.    Plaintiff incorporates paragraphs 1-101.

141.    This claim is against Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20, who are the RICO "persons."

142.    All loans made by Blue Mountain Loans to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (9%).

143.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

144.    Blue Mountain Loans is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

145.    Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20 are associated with this enterprise, in that they operate and manage it.

146.    Defendants conducted or participated in the conduct of the affairs of Blue Mountain Loans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

147.    Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

148.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

149.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Blue Mountain Loans at more than 18% interest (c) which loan was made on or after a date four years prior to the filing of this action.

150.    The class is so numerous that joinder of all members is not practicable. On

-19-

information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

151.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

        a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

        b.    Whether Blue Mountain Loans is an "enterprise."

        c.    Whether the Defendants named herein are associated with Blue Mountain Loans.

        d.    Whether the Defendants named herein conducted or participated in the affairs of Blue Mountain Loans through a pattern of making and collecting unlawful loans.

152.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

153.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

154.    A class action is superior for the fair and efficient adjudication of this matter, in that:

        a.    Individual actions are not economically feasible.

        b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.    Treble damages;

        ii.    Attorney's fees, litigation expenses and costs of suit; and

        iii.    Such other or further relief as the Court deems proper.

## COUNT V – RICO

155.    Plaintiff incorporates paragraphs 1-101.

156.    This claim is against Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20, who are the RICO "persons."

157.    All loans made by Blue Mountain Loans to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (9%).

158.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

159.    Blue Mountain Loans is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

160.    Defendants 391 Financial, Infinity, Tekambi, and John Does 1-20 conspired and agreed to operate Blue Mountain Loans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(d).

161.    Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

162.    Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

163.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made by Blue Mountain Loans at more than 18% interest (c) which loan was made on or after a date four years prior to the filing of this action.

164.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

165.    There are questions of law and fact common to the class members, which common

questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.    Whether Blue Mountain Loans is an "enterprise."

      c.    Whether the Defendants named herein agreed and conspired to make unlawful loans through by Blue Mountain Loans.

166.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

167.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

168.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.    Treble damages;

      ii.    Attorney's fees, litigation expenses and costs of suit; and

      iii.    Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com
Dedelman@edcombs.com
Jclark@edcombs.com
ahuzyk@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


<u>*/s/ Daniel A. Edelman*</u>
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman